UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:08CR00732 DJS (AGF) |
| JASON BEARD, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is before the Court on the pretrial motion filed by Defendant, Jason Beard. Pretrial matters were referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b). Defendant filed a motion to suppress evidence and statements. (Doc. # 21). An evidentiary hearing was held on March 10, 2009. The government was represented by Assistant United States Attorney Michael A. Reilly. Defendant was present and represented by his attorney, Assistant Federal Public Defender Michael Dwyer. At the hearing, the government presented the testimony of Officer Jason Chambers, an officer with the St. Louis Metropolitan Police Department (SLMPD), and he was cross-examined extensively by defense counsel. The Defendant presented the testimony of Officer Steve Schwerb, also an officer with SLMPD, who was partnered with Officer Chambers at the time of the arrest of Defendant. Based on the testimony and evidence adduced, and having had an opportunity to observe the demeanor and evaluate the credibility of the witnesses, the undersigned makes the following findings of

fact and conclusions of law.

## FINDINGS OF FACT

Defendant's arrest in this matter arose out of an investigation conducted by Officer Jason Chambers and his partner, Officer Steve Schwerb, beginning in December 2008, related to information obtained regarding alleged drug dealing by an individual at 2914 Keokuk, in St. Louis, Missouri. Officer Chambers has been employed with the SLMPD for approximately three years. After completing his eight-month course of training at the Police Academy, followed by field training, Officer Chambers was assigned to a radio car in the First District. For more than a year, he has been assigned to the tactical deployment unit of the First District of the SLMPD, whose function is to focus on high crime areas within the district, primarily for narcotics offenses, with some follow-up on matters such as robberies and assaults. As compared to work on patrol, members of the tactical unit are engaged in more long-term investigations, which may involve surveillance, the investigation of the history of suspects, and work with confidential informants.

In December 2008, Officer Chambers was partnered with Officer Schwerb, who had been a police officer for approximately 12 years. Officer Chambers estimated that as an officer with SLMPD he had participated in approximately 100 narcotics investigations, and he estimated that his partner, Officer Schwerb, had probably participated in more than 1000 such investigations.

On December 2, 2008, Officers Chambers and Schwerb received information from

a confidential informant ("CI") that an individual named "Jason" was selling heroin from 2914 Keokuk (the "Residence"), and that Jason was also in possession of a .38 caliber Smith & Wesson handgun, which he kept inside the Residence. The CI also reported that Jason had bragged about being on parole for robbery. The CI described Jason as a black male, in his late twenties, approximately 5'10" tall, with a light complexion, slim build, and a "low haircut." The officers received this information from the CI in a face-to-face meeting, in which they were able to assess his/her credibility, and believed the information to be credible. The CI was someone who had provided information related to narcotics in the past; the CI's information had proven reliable in the past, and seizures of narcotics had resulted from the information received. Officer Chambers had been dealing with this CI for several months, but he believed that Officer Schwerb had been dealing with the CI for several years.

Officer Chambers was familiar with the 2900 block of Keokuk, and considered it to be a high crime area, typically involving the sale of narcotics and robberies. The officers checked or monitored the database of hotline calls maintained by SLMPD, and determined that during the period from May - October, 2008, SLMPD had received 7 hotline calls in which callers reported something to the effect that they had observed what appeared to be narcotics sales at the Residence. In an attempt to follow-up on these calls, Officer Chambers had previously stopped at the Residence twice and knocked on the door, but no one answered either time.

Following the meeting with the CI, Officer Schwerb ran several computer checks

3

in an attempt to further investigate the information received, and he shared the information received with Officer Chambers. Using the crime matrix program, Officer Schwerb was able to determine that an individual named Jason Beard had been associated with the Residence. Through the search of a consolidated database, that included records from the Department of Revenue and criminal history records, the officers learned that Jason Beard was listed as residing at the Residence. They also obtained pedigree information related to Jason Beard, including his photograph, a description of his height and weight, and prior criminal history, and the physical descriptors regarding Jason Beard were consistent with the information provided by the CI. A search of the criminal history databases further corroborated the CI's information, as the computer check revealed that Jason Beard had a prior criminal conviction for robbery, as well as convictions for possession of a controlled substance and distribution of a controlled substance. The information received from the database searches further increased the officers' suspicion regarding the suspect.

Sometime during the morning of December 8, 2008, Officers Chambers and Schwerb conducted surveillance of the Residence. They were dressed in plain clothes, and were wearing jackets that identified them as police in bold letters on the front and back. They stationed themselves across the street from the Residence, at the rear of the building at 2915 Keokuk, between 2913 and 2915 Keokuk. From that point they had an unobstructed view of the gangway on the east side of the Residence (i.e., the gangway on the left side of the Residence, viewed from the front). See Govt. Ex. M-5; Def. Ex. 1.

4

During this time period, the officers observed what they believed, based upon their experience, to be two hand-to-hand drug transactions. The first occurred a few minutes after they began their surveillance. An individual approached the Residence on foot and immediately walked down the gangway on the east side of the Residence. As the individual entered the gangway, an individual, later identified as Defendant Beard, approached from behind the Residence, and met the individual in the middle of the gangway, but closer to the front of the Residence than the back. The officers saw the individual hand Defendant what they believed to be cash, saw movement of Defendant's body consistent with taking the money, and then saw Defendant hand something to the individual. The individual then turned and walked away, and Defendant Beard walked back behind the Residence. The officers were not able to see exactly what was in Defendant's hand, but the item was small enough to fit in his hand. The second transaction occurred approximately eight minutes after the first, and proceeded in the same fashion. The officers ended their surveillance after approximately 30 minutes.

Later that same day, between approximately 1:30-2:00 p.m., the officers were driving down Keokuk, heading east, and they saw Defendant leave the Residence. The officers were driving an unmarked car and were still dressed in plain clothes with police jackets. Defendant walked toward a white Winstar vehicle that was parked in front of the Residence, facing west. The officers decided to approach Defendant, advise him of their investigation, and see if he would give consent to search the Residence. The officers made a U-turn, but were unable to reach Defendant before he entered the passenger side

of the white van and the van began to drive away. The officers activated their lights and curbed the vehicle at approximately Keokuk and S. Compton, which is approximately three blocks west of the Residence.

Officer Chambers approached the vehicle on the front passenger side, where Defendant was seated, and spoke to Defendant. Officer Schwerb approached the driver, later identified as Ronald Wainwright, and spoke to him. In light of the information they had received regarding Defendant, including his criminal history and the CI's information that Defendant had a handgun, Officer Chambers was concerned that Defendant might be armed. He therefore asked Defendant to exit the vehicle and conducted a pat-down for officer safety. He did not locate any weapons or contraband during the pat-down. Because he wanted to ask Defendant questions regarding their investigation, he advised Defendant of his rights under Miranda, by reading the rights from a card that he keeps with him. Defendant appeared to understand what was being said to him, and indicated that he understood his rights and was willing to speak to them. At the time, Defendant was not in handcuffs or restrained in any other manner.

Officer Chambers asked Defendant where he lived, and Defendant indicated that he stayed down the street at 2914 Keokuk. Officer Chambers advised Defendant of the information they had received, and he responded by saying, "I don't sell dope. You can go back and search if you want." Defendant was then taken to the officers' car, and the officers presented him with a written consent to search form, saying essentially that it was a written form allowing what he had just agreed to. At the time, Defendant still was not

6

placed in handcuffs. Defendant signed the consent to search form, which provided consent for the two officers to search the Residence at 2914 Keokuk. Govt. Ex. M6. At the time he signed the consent to search form, Defendant appeared to be of normal intelligence, did not appear to be confused, and did not appear to be under the influence of drugs or narcotics. He appeared to understand what was being said to him and did not indicate that he did not understand either what was being said or the consent to search form. No promises or threats were made to induce Defendant to sign the form. As reflected on the back of the form, Defendant was born on September 24, 1980 and was 28 years old at the time of the events. Above Defendant's signature the form states:

> I understand that I have the right to refuse to consent to the search described above and to refuse to sign this form.
>
> I further state that no promises, threats, force or physical or mental coercion of any kind whatsoever have been used against me to get me to consent to the search described above or to sign this form.

The form was signed by Defendant at 1:55 p.m., and his signature was witnessed by both officers. From the time the officers first curbed the vehicle until Defendant provided his oral consent to search, not more than five minutes had passed. From the time of the initial stop until he signed the consent to search form, Officer Chambers estimated that roughly ten minutes had passed.

Defendant indicated that he wanted to be present while the search was conducted, and the officers agreed but advised him that he would need to be placed in handcuffs for officer safety. The officers advised their unit supervisor, Sergeant Drago, that they were

7

going to conduct a search, and Sergeant Drago and other officers arrived to assist with the search.  The officers entered the Residence using a key that Defendant provided to them.  Consistent with their normal practice and to protect officer safety, Defendant was placed in handcuffs and the officers also asked Defendant if he any weapons in the Residence.  Defendant responded that he collected swords and had multiple swords in the Residence.  He also stated that he had a "house gun," which he described as a .38 revolver, that he kept upstairs under the night stand next to the bed.

The Residence was thereafter searched, and Officer Schwerb located a .38 caliber Smith & Wesson revolver in the place where Defendant had indicated it could be found.  It was loaded with five live rounds.  No narcotics were located.  Having previously confirmed that Defendant had prior felony convictions, the officers advised Defendant that they were placing him under arrest for unlawful possession of a weapon.  Officer Chambers then asked Defendant if he remembered the rights of which he had previously advised Defendant, and he said he did.  Officer Chambers then asked Defendant where he had gotten the gun, and he responded that he had bought it off the street three months ago.

The officers asked Defendant if he was willing to make a written statement, and he agreed.  While seated in the dining room, Defendant was presented a written warning and waiver form.  Govt. Ex. M7.  The officers completed the information at the top of the form after reviewing that information with Defendant.  They then reviewed the Waiver Certificate with Defendant, which advises Defendant of his <u>Miranda</u> rights.  Defendant

indicated that he understood his rights, and initialed each of the rights. After the advice of rights and above the signature line, the form states: "I have read and understand all these rights. I voluntarily waive the rights and desire to make a statement." Defendant signed the Waiver. He then made a written statement, in his own handwriting, acknowledging that he had purchased a .38 handgun and describing the circumstances surrounding his purchase. Defendant signed the written statement, and his signature was witnessed at 2:35 p.m. Above his signature the form reads:

> I, ___Jason Beard___, have read or have had read to me this statement which begins on page _1_. I fully understand the contents of this entire statement made by me. The statement is true. I have initialed all corrections and have signed the bottom of each page containing the statement. I have made this statement freely without hope of reward or benefit, without threat of punishment, and without coercion, unlawful influence, or unlawful inducement.

No promises or threats were made to induce Defendant's written statement, and as before, Defendant did not appear to be under the influence of drugs or alcohol and appeared to understand what was being said.

At some point, not further identified at the hearing, the white van was searched, but no drugs were located. Nor were any narcotics found when a full search was later conducted of Defendant's person.

## CONCLUSIONS OF LAW

Defendant asserts that the officers lacked probable cause to arrest Defendant. It appears from his motion that Defendant contends that the arrest took place at the time the van initially was pulled over. Defendant further asserts that because the arrest was

9

illegal, Defendant's oral statements, consent to search, and written statements, as well as the firearm later seized from the Residence, must be suppressed as the fruit of the illegal arrest, citing Wong Sun v. United States, 371 U.S. 471 (1963). The Court finds no merit to Defendant's arguments.

### A. Validity of the Stop

Officers may briefly detain an individual for an investigative purpose when they have a reasonable belief that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999). The level of proof necessary is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow, 490 U.S. 1, 7 (1989). The reasonable belief requires suspicion based on "'particularized, objective facts which, when taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" United States v. Beck, 140 F.3d 1129, 1136 (8th Cir. 1998) (quoting United Sates v. Martin, 706 F.2d 263, 265 (8th Cir. 1983)). "A series of acts that appear innocent, when viewed separately, may warrant further investigation when viewed together." United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994). In assessing the reasonableness of the suspicion, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Cortez, 499 U.S. 411, 418 (1981)).

Here, the officers had more than reasonable suspicion to support an investigative detention. The investigation began based on information received from an informant who had proven reliable in the past. The officers corroborated that information, including Defendant's connection to the Residence, his physical description, and his prior conviction for a robbery, and also determined that Defendant has prior convictions for narcotics offenses. They then observed what they believed to be two hand-to-hand transactions, within approximately a thirty-minute time period, and based on their experience and the particular circumstances surrounding the transactions, the Court finds that belief was reasonable.[1] In light of the totality of information, the officers had a reasonable basis for the stop. See United States v. Pelayo-Ruelas, 345 F.3d 589, 590-92 (8th Cir. 2003) (finding reasonable basis for investigatory detention based on information from reliable informant describing car, nationality of occupants, general time frame, and destination of vehicle, where officers corroborated the information and determined vehicle was registered to fictitious address); United States v. Spotts, 275 F.3d 714, 718

---

[1] Defendant questions whether the officers could possibly have seen an actual exchange of money from their location across the street. But even if the officers merely assumed they were seeing an exchange of currency, they were justified in believing these were drug transactions from the overall suspicious circumstances surrounding the events. In each instance an individual approached on foot; met with Defendant in the gangway; Defendant, who apparently knew they were coming, approached from the back of the Residence; and some sort of brief transaction took place, after which the individual promptly left. See United States v. Rivera, 370 F.3d 730, 733 (8th Cir. 2004) (finding probable cause to believe defendant was participant in controlled methamphetamine sale where prior to meet, defendant got out of car and appeared later to surveil parking lot during the meet, car was same one used in prior controlled buys, and defendant left the area when police converged).

(8th Cir. 2002) (holding that "[t]he Fourth Amendment permits police to make an investigative stop . . . if they have a 'reasonable suspicion that [an individual is] involved in criminal activity'").

The Court also finds that officers did not exceed the scope of that Terry stop. "An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'" United States v. Maltais, 403 F.3d 550, 556 (8th Cir. 2005) (quoting United States v. Navarrete-Barron, 192 F.3d 786, 790 (8th Cir. 1999)). Here the questioning was very brief, and was directly related to the subject of their investigation. United States v. Martinez, 462 F.3d 903, 907 (8th Cir. 2006). The officers also had a reasonable basis to believe that Defendant might be armed, based on the information received from the reliable CI, which information was strengthened by their own investigation and surveillance connecting Defendant with drug transactions. They therefore did not exceed the scope of the investigative stop by conducting a pat-down search. See Id. at 906-07 (holding that placing individual suspected of armed robbery in handcuffs did not convert Terry stop into arrest); Pelayo-Ruelas, 345 F.3d at 593 (holding that where defendant was removed from car and patted down in connection with drug investigation, Miranda warnings were not required and statements were not subject to suppression, where only one agent approached and questioned defendant, agent was in plain clothes and did not draw weapon, atmosphere was like typical traffic stop, and investigation was reasonably limited to confirming or dispelling suspicions).

Nor did the officers exceed the scope of the investigatory detention by requesting

consent to search the Residence. Up until this point, the questioning had been extremely brief; the request was made within five minutes of the stop; it was reasonably related to the cause of their suspicions; and the officers did nothing to suggest compliance might be compelled. See United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2003) ("the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances"). Indeed here, Defendant offered to permit a search, without being first asked, and both the execution of the written consent to search form and the few minutes it took to complete were simply a product of Defendant's offer. See United States v. Drayton, 536 U.S. 194, 207-08 (2002) ("The fact the officers may have had reasonable suspicion does not prevent them from relying on a citizen's consent to the search.").

Even if the detention were found to be an arrest – and here the Court finds it was not – Defendant's motion would still fail because at the time of the stop the officers had probable cause to believe that Defendant had engaged in criminal conduct. Probable cause exists "when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested." United States v. Oropesa, 316 F.3d 762, 768 (8th Cir. 2003) (quoting United States v. Hartje, 251 F.3d 771, 775 (8th Cir. 2001)); accord United States v. Travis, 993 F.2d 1316, 1323 (8th Cir. 1993). Here, the officers had information from a reliable confidential informant, which they corroborated through computer investigation

and their own surveillance, followed by their observation of what appeared to be hand-to-hand transactions. Together, this information provided ample probable cause to arrest Defendant. See United States v. Gabrio, 295 F.3d 880, 882-83 (8th Cir. 2002) (holding that information either from a reliable informant or from a tip that is corroborated by independent evidence can provide basis for probable cause); United States v. Powell, 39 F.3d 894, 895-96 (8th Cir. 1994) (holding that information from reliable source, corroborated by observation of unusual pedestrian activity consistent with drug sales, was sufficient for probable cause to arrest); United States v. Sherrill, 27 F.3d 344, 346 (8th Cir. 1994) (same). That the information from the CI was received during a face-to-face encounter, in which the officers had the ability to assess the CI's credibility, further enhances the reliability of the information. See United States v. Nieman, 520 F.3d 834, 840 (8th Cir. 2008) (citing United States v. Robertson, 39 F.3d 891, 893 (8th Cir. 1994)).

### B. Consent to Search

Defendant does not independently challenge the voluntariness of the written consent to search, asserting only that it was the result of an unlawful arrest. Having found that the events leading up to the consent search were proper, Defendant's arguments related to the search and the seizure of the firearm therefore also fail. United States v. Lyton, 161 F.3d 1168, 1171 (8th Cir. 1998); United States v. Miller, 20 F.3d 926, 930 (8th Cir. 1994). The Court will, nonetheless, briefly address the consent search, which it also finds to be proper.

In the context of a warrantless search, it is the prosecution's burden to prove by a

preponderance of the evidence that a consent to search was freely given. United States v. White, 81 F.3d 775, 780 (8th Cir. 1996); Miller, 20 F.3d at 930. The consent, however, need not necessarily be knowing and intelligent. Schneckloth v. Bustamonte, 412 U.S. 218, 241 (1973). One need not be aware of his or her right to consent in order to make the consent voluntary. United States v. Chaidez, 906 F.2d 377, 380 (8th Cir. 1990).

A consent is voluntary if it is the product of free choice, the defendant's will is not overborne, and the consent is not given under coercion or duress. In determining whether the prosecution has met its burden, courts look to both the characteristics of the accused and the details of the environment in which the consent was given. Chaidez, 906 F.2d at 380-81. Voluntariness is a fact question to be determined from the totality of the circumstances present. Schneckloth, 412 U.S. at 226-227; United States v. Matlock, 415 U.S. 164 (1964). The factors to be considered in determining whether consent is voluntary include:

> (1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his Miranda rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals.

United States v. Alcantar, 271 F.3d 731, 737 (8th Cir. 2001); accord United States v. Hathcock, 103 F.3d 715, 719-20 (8th Cir. 1997); Chaidez, 906 F.2d at 381. Among the factors to be considered in examining the environment surrounding the consent, courts examine: the length of time a person is detained and questioned; whether the person was

threatened, physically intimidated, or punished by the police; whether the defendant relied upon promises or misrepresentations made by the police; whether the defendant was in custody; whether the consent occurred in a public or secluded location; and whether the defendant objected to the search or stood silently by while the search occurred. United States v. Smith, 260 F.3d 922, 924 (8th Cir. 2001); Chaidez, 906 F.2d at 381. The foregoing factors are not to be applied mechanically, and no single factor is dispositive. Schneckloth, 412 U.S. at 226-27; Chaidez, 906 F2d at 381.

Applying the above factors, the government has met its burden to establish that the consent by Defendant was voluntary. On this record there is nothing to suggest that Defendant's will was overborne. United States v. Poulack, 236 F.3d 932, 936 (8th Cir. 2001); Miller, 20 F.3d at 930. On the contrary, all of the factors identified in Alcantar weigh in favor of a finding of voluntariness. At the time he signed the written consent form, Defendant was 28 years old, did not appear to be under the influence of any drugs or narcotics, appeared to understand what was being said, and provided responsive answers. Prior to requesting consent, and though not required to do so, the officers advised Defendant of his rights under Miranda. Defendant also had previous experience with law enforcement. Further, there were only two officers present at the time consent was requested, and only one of those officers was speaking to Defendant; only approximately ten minutes had passed from the time of the stop until the written consent was signed; the consent was given in the middle of the afternoon on a public street; no threats or promises were made to induce Defendant to consent; and neither of the officers

displayed their firearms or otherwise exerted any force. Indeed, Defendant offered to let the officers search his Residence before he was even asked. He thereafter signed a written consent to search form in which he confirmed that he had the right to refuse to consent and that no threats or promises had been made to induce his consent. Thus, the firearm found as a result of the search is not subject to suppression.

### C. Statements Made by Defendant

Again, having found the validity of the initial stop and search, Defendant's argument for the suppression of his statements also fails. But there is no independent basis to suppress the oral or written statements made by Defendant in any event.

A defendant may knowingly and intelligently waive her rights and agree to answer questions. Miranda v. Arizona, 384 U.S. 436, 479 (1966). When the prosecution seeks to introduce in evidence a statement made by a defendant while in custody, it has the burden of showing by a preponderance of the evidence that the statement was made after a voluntary, knowing, and intelligent waiver of Miranda rights by the defendant. Colorado v. Connelly, 479 U.S. 157 (1986).[2] The court must examine the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception, and whether the waiver was made with an awareness of the right being abandoned and

---

[2] The Court notes that Defendant's oral and written statements were made within six hours of his arrest. See 18 U.S.C. §3501; Corley v. United States, No. 07-10441, __ S. Ct. ___, 2009 WL901513, at *12 (Apr. 6, 2009).

the consequences of the decision to abandon it.  Moran v. Burbine, 475 U.S. 412 (1986).  The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne.  Connelly, 479 U.S. at 170;  Haynes v. Washington, 373 U.S. 503 (1963).  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  Dickerson v. United States, 530 U.S. 428, 444 (2000).  As the Supreme Court has recognized, however, "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of Miranda, are rare."  Berkemer v. McCarty, 468 U.S. 420, 433 n.20 (1984); accord Dickerson, 530 U.S. at 444.

At the start of the search, Defendant was asked whether he had any weapons in the house, and he advised the officers that he had multiple swords and a firearm in the Residence.  At the time Defendant was not under arrest.  While he was in handcuffs at the time, he had specifically been advised that such cuffs would be required for officer safety if he wished to be present during the search.  Prior to asking these questions, the officers had also already advised Defendant of his rights under Miranda.  As such, and for the reasons set forth above, the Court finds that Defendant's answers to their questions regarding whether there were any weapons in the Residence were voluntary and are not subject to suppression.

After the officers located the firearm and placed Defendant under arrest, Defendant confirmed that he remembered the Miranda rights previously read to him.  As

18

discussed above, Defendant was fully capable of understanding his rights, and there is no evidence of any force or threats being made at this time. Prior to making any written statements, Defendant signed a written waiver form in which he was again advised of his rights under Miranda. Defendant confirmed his understanding of his rights and the fact that his statements were voluntary. Based on the totality of the circumstances, the Court finds Defendant knowingly and voluntarily waived his rights and made voluntary oral and written statements.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant's Motion to Suppress Evidence and Statements [Doc. No. 21] be **denied**.

The parties are advised that they have eleven (11) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir.1990).

                                             _/s/ Audrey G. Fleissig_
                                             AUDREY G. FLEISSIG
                                             United States Magistrate Judge

Dated this 8th day of April, 2009.